Louisville Provision Company v. Commissioner.
Louisville Provision Co. v. Commissioner
Docket No. 107928.
United States Tax Court
1943 Tax Ct. Memo LEXIS 350; 1 T.C.M. (CCH) 960; T.C.M. (RIA) 43191; April 22, 1943
*350 Charles I. Dawson, Esq., 1805 Kentucky Home Life Bldg., Louisville, Ky., for the petitioner. Sidney Gambill, Esq., and R. E. Maiden, Jr., Esq., for the respondent. DISNEY
Memorandum Findings of Fact and Opinion DISNEY, Judge: This proceeding involves the redetermination of a deficiency of $56,692.64 in income tax for the year ended October 31, 1935, and a delinquency penalty of $14,173.16. The issues presented for decision are whether during the taxable year petitioner shifted to other taxes imposed upon but not paid by it for the processing of hogs, and whether the deficiency is subject to a penalty of 25 per cent for failure to file an unjust enrichment tax return within the time prescribed by law. The stipulations of fact filed by the parties are incorporated herein by reference as part of our findings of fact. Material parts thereof are set forth in the findings made from other evidence. Findings of Fact The petitioner, a Kentucky corporation, was organized in 1932 and in November of that year acquired most of the assets of a bankrupt corporation of the same name and began business operations. The capital stock outstanding on October 31, 1935, was $61,735. The par value of *351 the common stock was $10 per share. At all times important practically all of the outstanding stock of petitioner was owned by F. E. Wernke, president of petitioner since its organization, and Emile Steinfeld, a member of the law firm of Steinfeld & Steinfeld. Louisville, Kentucky. Wernke has at all times since the organization of petitioner been its principal stockholder. With the exception of a few shares held by three stockholders during the taxable year, all of petitioner's capital stock was owned by its employees. The petitioner kept its books and filed its returns on the accrual basis of accounting. The petitioner rented the plant, including machinery and equipment, occupied by it at an annual rental of $9,600. The lease entered into on January 1, 1933, for a term of 15 years, required petitioner to pay the taxes on the leased property, keep the property in repair, and to carry fire and tornado insurance thereon in a sum of not less than $200,000. Structural changes to the building were to be made and new equipment acquired at the expense of petitioner. Petitioner made some permanent improvements to the building and purchased some new equipment. Petitioner amortized the permanent *352 improvements over the life of the lease. The amounts thereof were claimed and allowed as deductions in income tax returns of petitioner. Petitioner subleased a portion of the building, known as an ice factory, during the taxable year at an annual rental of $11,000. During the taxable year petitioner paid the additional sum of $600 as rent for a coal yard for the storage of coal used at the plant, and received rental in the amount of $882.80 for a building in Lexington, Kentucky. Petitioner has at all times been engaged in the general packing house business, a highly competitive business, in Louisville, Kentucky. It purchased and slaughtered cattle, sheep, calves and hogs and sold the product in its fresh state or otherwise after further processing. At times when considered advantageous, petitioner purchased pork, beef, beef livers, sweetbreads and other meat products from other packers, some of which it sold without further processing. Petitioner also purchased from other packers and sold without further processing, canned meats, dressed poultry, fish, eggs, butter, cheese and lard substitutes. Live stock was purchased in an open competitive market. All the beef produced by petitioner *353 from its own slaughtering and purchased by it from other packers was sold in a fresh state without further processing except such amounts as were used by it in the manufacture of chili, corned beef and sausage. Veal and lamb produced by petitioner were sold in a fresh state without further processing. Fresh pork purchased by petitioner from other packers and produced by it from its own slaughtering was sold by petitioner in a fresh state or after further processing into sausage, cured, smoked or cooked meats. Fresh hams purchased by petitioner were commingled with like product cut from hogs of its own slaughter and lost their identity. About 99 per cent of the fresh hams purchased by petitioner from other packers and cut from hogs of its own slaughter was processed into smoked hams by petitioner. From 85 to 90 per cent of the shoulders of hogs were cured and smoked, and practically all of the bacon cuts were processed into bacon. Sausage produced by petitioner was manufactured from meats produced from its own slaughter and purchased from other packers. Some of it was manufactured exclusively from pork. Other sausage contained from 8 per cent to 80 per cent pork, based upon finished *354 weight, and the remainder beef. All boxed sliced bacon and boiled and baked hams were of petitioner's slaughter. It cost petitioner more per pound to process pork than it did to process beef. The average turnover of beef was about every eight days. In 1933, 1934 and 1935 it took petitioner from three to four weeks to cure hams, from 15 to 25 days to cure shoulders and from 14 to 16 days to cure and smoke bacon ready for market. Petitioner produced inedible products in connection with the slaughter of live stock. Tankage, material used as a base for fertilizer, and as feed for hogs, was produced from cattle and hogs; tallow from beef and sheep; and grease from hogs. It also saved and sold cattle hides, calf skins and bones. Hams were cooked and baked, and chili, a product composed wholly of beef, was produced in the sausage department of petitioner by the employees thereof. Occasionally when the machines used for that purpose were out of order, hamburger meat, composed entirely of beef, was ground in machines in the sausage department by employees of the beef department. Practically every day petitioner made cut-out tests in order to determine the profit it would realize or loss *355 it would sustain on particular lots of hogs, assuming that the hogs were sold on the day of their slaughter at petitioner's fresh meat prices prevailing on that day. Loss or gain was determined by deducting total cost from the total assumed receipts. During the time the Agricultural Adjustment Act was in effect taxes imposed thereunder for the processing of hogs were treated on the books of petitioner as part of the cost of hogs. Petitioner endeavored to recover all of its costs of doing business, including state and Federal taxes, and operate at a profit. The books of petitioner contain separate accounts showing the amounts paid by it for hogs, cattle, calves and sheep and the weight thereof. Purchases of other material for resale were kept in two other accounts. One account, known as the produce account, contained costs of poultry, butter and eggs, and other produce articles, and the other account, captioned "Miscellaneous Meat Purchases" carried all other items purchased for resale or the manufacture of sausage. The accounts did not show the amount paid for each article. Separate accounts were maintained for purchases of spice, salt, casings, cartons, and similar articles, but *356 no allocations of the amounts of each were ever made to departments of petitioner's business, i.e., to the beef, produce, compound, inedible, pork and sausage departments. Invoices for all of the purchases are still in the possession of petitioner and they show the character and amount of each item. Freight paid on purchased articles was entered in one account without allocation to the product in respect of which it was paid, and petitioner was unable to make an accurate allocation to the several departments of its business. Petitioner's records show only the gross amount of freight paid on articles sold, and allowances made to vendees. Payroll records of petitioner show the amount paid each employee and the character of work performed by him. Some employees worked in more than one department. Costs of light, heat and power, laundry, repairs, rent, depreciation of machinery and equipment and of similar items were kept in appropriate accounts, but without allocation to the different products in respect of which such costs were incurred. All of petitioner's articles were sold, delivered to the purchaser's place of business. Petitioner had no customers beyond about 200 miles from its *357 plant. Almost all of its deliveries were made by truck. Salesmen's commissions and expenses, delivery costs and administrative expenses were not allocated on petitioner's books among departments. Salesmen's commissions were not paid on all articles. The activities of the salesmen were not confined to any department. Petitioner's receipts from sales were entered in about 25 general classifications. Sales of beef, veal and mutton were carried in one account; separate accounts were maintained for sausage, and various cuts of beef. Petitioner's records show the amounts received during the taxable year from the sale of each of the different pork products sold by it and the sales weight of each, but without allocation as between ownslaughter pork and pork purchased from other packers. The purchase price of materials purchased on the outside for the manufacture of sausage was charged to petitioner's sausage department as a cost of manufacture. Petitioner was able to determine from an examination of invoices received for purchased meat whether or not the items were to be sold without or after further processing by it. Beef and pork of petitioner's own slaughter used in the manufacture of *358 sausage were charged to the sausage department at the prevailing market price, with a balancing credit to the department from which it was transferred. The charge made for the beef transferred in the taxable year was $62,929.32, this being the value of the meat based upon the Chicago market. Sales of boiled and baked hams were carried in a separate account. Petitioner's records show the total weight and selling price of beef, veal and mutton sold during the taxable year and the amount received for hides. They also show total receipts from grease, tankage, bones and tallow respectively, but no allocation thereof as between beef and pork or as between own-slaughter pork and purchased pork. Amounts received from the sale of grease were credited by petitioner to pork income. Petitioner kept a daily record of the amount of beef and pork used in the manufacture of sausage that day and the amount of sausage made each day. The record did not, however, show what portion of the meats was purchased from other packers. Petitioner's sales records show the pounds of sausage sold each month and the amount received therefor, but they contain no allocation as between beef and pork and as between *359 ownslaughter and purchased pork. Invoices in the possession of petitioner show the amount of beef and pork purchased for, and used in the production of, sausage. Petitioner's price lists, issued weekly, were based upon the Chicago market, modified, when necessary, to meet local conditions, including supply and demand. Petitioner's prices were subject to change at any time and occasionally were changed to meet market conditions. At times petitioner sold some items of meat below the Chicago market. It could not fix a price for a commodity and obtain the amount irrespective of market conditions generally. Petitioner endeavored to obtain the highest possible price for its products. Competition of other packers located in and out of Louisville compelled petitioner to keep its prices in line with its competitors. Petitioner did not exchange price lists with other packers in Louisville. The supply of and demand for live stock and processed meat are the controlling factors in fixing prices for packing house products. No portion of the processing tax imposed upon petitioner in 1935 was included as a separate item in invoices for products sold by it, or collected from customers as a separate *360 item. Petitioner did not pay, as a separate item, processing taxes on pork purchased by it. The net sales (gross, less freight and adjustments), cost of sales, distribution expenses, operating profit, and other income and costs of petitioner for the taxable year were as follows: Net sales
$1,868,195.51
Cost of sales
1,577,671.60
Gross profit on sales
290,523.91
Distribution expenses
159,185.69
Operating profit
131,338.22
Other income
[1] $14,571.85 Other costs
11,170.26
3,401.59
Net profit
$ 134,739.81
Deductions to recon-
cile to Title I: Charges affecting
prior years
$ 60.41
Processing tax paid
36,236.80
36,297.21
Net profit adjusted
$ 98,442.60
Petitioner's net sales in the taxable year of articles with respect to which processing taxes were imposed and other articles, were as follows: Tax imposed articles
Pork (other than sausage and boiled and
baked hams)
$859,951.81
Sausage
$247,140.45
Less chili
10,920.00
236,220.45
Boiled and baked hams
52,297.69
Grease
9,797.37
Tankage
1,934.19
$1,160,201.51
Other articles
Tankage (beef content)
$ 4,513.10
Bones
1,062.17
Tallow
8,838.84
Produce, etc
77,118.26
Beef, veal and lamb
616,461.63
707,994.00
Total
$1,868,195.51
*361 The net sales, net income or loss of petitioner for the taxable years ended October 31, in 1933 to 1941 inclusive were as follows: Year ended
Net Sales
Net Income
Oct. 31, 1933
$1,092,146.71
$48,595.04
Oct. 31, 1934
1,544,012.80
21,539.93
Oct. 31, 1935
1,868,195.51
98,442.60
Oct. 31, 1936
1,992,104.19
[1] 11,472.52
Oct. 31, 1937
2,459,404.69
[1] 8,507.69
Oct. 31, 1938
2,259,586.21
1,592.79
Oct. 31, 1939
2,511,037.88
[1] 774.68 Oct. 31, 1940
2,467,288.97
4,350.79
Oct. 31, 1941
3,316,888.98
17,088.72
In determining net income for the fiscal year ended October 31, 1934, petitioner deducted $167,029.08 for processing taxes. During the latter part of March 1935 the law firm of Steinfeld & Steinfeld, Louisville, Ky., was retained by petitioner under an oral contract to test the constitutionality of the Agricultural Adjustment Act and to enjoin the collector from collecting from it the amount of taxes imposed thereunder. The firm was to receive for its services 20 per cent of the amount of tax saved. Suit was filed in the District Court of the United States for the Western District of Kentucky on June 5, 1935, and decided against petitioner on *362 November 5, 1935. On July 31, 1935, a temporary restraining order against collection of taxes was issued. On December 3, 1935, petitioner filed a motion for reconsideration of the adverse decision. The court took no action on the motion. The Act was declared unconstitutional in United States v. Butler, 297 U.S. 1, on January 6, 1936. The District Court entered its final order in the case on January 16, 1936, dismissing the action. Steinfeld & Steinfeld agreed at the time of their employment to take stock of petitioner in part payment of their fee. No specified amount of stock was agreed upon. Subsequently Steinfeld & Steinfeld employed F. E. Wernke to determine whether other packers involved in similar litigation were complying with court orders directing payment of certain amounts in escrow. Emile Steinfeld, a member of the law firm, agreed to pay Wernke for services rendered in connection with processing tax suits, including that of petitioner, and for expenses paid out by Wernke. Wernke paid expenses of Steinfeld and others, in connection with such processing tax suits, in 1935. On January 18, 1936, petitioner credited the account of Steinfeld & *363 Steinfeld on its books with $20,453.77 for services rendered by the firm in the litigation. At the same time, there was charged to the account $7,500 for cash paid to the firm and $13,000 for 1,300 shares of stock. Stock of the par value of $6,500 was issued to Emile Steinfeld on January 20, 1936. At the written request of Emile Steinfeld, on the same day $6,500 par value of the stock to which his firm was entitled as part of its fee was issued to F. E. Wernke for expenses paid by him and for services rendered by him to the firm in connection with the abovementioned processing tax suits. The stock is still outstanding. No part of the fee was accrued upon the books of petitioner in the taxable year. The amount of $20,453.77 was allowed as a deduction in the income tax return of petitioner for the taxable year as legal fees incurred in the litigation. In addition to the stock Wernke received $2,175 in cash from Emile Steinfeld in 1936. F. E. Wernke filed his income tax returns on the cash basis. His return for 1936 showed income only from salary, etc., from petitioner and from dividends. Attached to the return was a statement reading as follows: "Received stock in Louisville Provision *364 Co. to reimburse me for expenses incurred not considered as income in my report for the year 1936. An itemized list of expenses is in my possession." Wernke's return was later adjusted, and additional tax paid, based on receipt of income of $6,500 stock of petitioner. For the year ended October 31, 1934, petitioner paid processing taxes in the amount of $167,029.08. Petitioner paid processing taxes of $36,236.80 for the months of November and December 1934. Processing taxes in the amount of $95,048.62 for the remainder of the taxable year were imposed upon but not paid by petitioner. Petitioner communicated with other packers in Louisville, Ky., to obtain a record of their operations during the six-year period preceding the imposition of the processing tax on hogs for the purpose of making a comparison of their average margin for such period with petitioner's margin for the taxable year. On account of loss of records and other causes petitioner was unable to acquire the figures necessary to make the comparison. The respondent never furnished the petitioner with an average margin of representative concerns engaged in a similar business and similarly circumstanced. The petitioner *365 did not submit in the unjust enrichment tax return filed by it, and otherwise has not furnished to respondent, any marginal computations of representative concerns for the six-year period preceding the imposition of the processing tax. Petitioner did not at any time request respondent to furnish it such information. The petitioner filed an unjust enrichment tax return on May 15, 1937, with the collector for the district of Kentucky, disclosing a loss of $136,283.92 in pork operations during the entire taxable year. The return was not placed in evidence. In his determination of the deficiency respondent computed net income of $101,041.89 for the entire taxable year from the sale of articles processed from hogs and net income of $91,665.93 from the sale of pork with respect to which the processing tax was imposed but not paid. The last figure was computed in the following manner: Pounds sold
6,518,338
Proceeds from sales
$982,076.88
Cost of material
$596,998.35
Production
150,978.49
747,976.84
Gross income
234,100.04
[1] Deductions 79,675.96
Net income
$154,424.08
Net income per pound
$.023690713
Non-tax paid pounds sold
3,869,277
Net income from sale of non-tax paid pounds
$ 91,665.93
*366 The respondent limited taxable net income to $87,058.73, this being the processing tax at the rate of $2.25 per hundred pounds on 3,869,277 live-weight pounds of hogs processed and sold by petitioner from January 1, 1935, to October 31, 1935, on which the processing tax was imposed but not paid. In his determination of the deficiency the respondent eliminated sales of purchased pork in his computation of net income by deducting from the total of all sales of pork products, the cost of such pork, plus 1 1/2 cents per pound, the total thus deducted being $178,922.54. The mark-up of 1 1/2 cents per pound was estimated by respondent. He also allocated as a credit to costs of own-slaughter pork $6,356.71 and $316.19, a total of $6,672.90, of the rent received from leased property and $899.19 of bad debt recoveries of $1,869.02. No part of the legal fee of $20,453.77 paid to Steinfeld & Steinfeld was allowed as a deduction in computing net income from sales of pork or other products. Respondent deducted from gross profit realized from the sale of own-slaughter pork the amount of $42,015.16 for beef transferred *367 by petitioner from its beef department to its sausage department and used in the production of sausage. Opinion Petitioner was a first domestic processor of hogs and as such was subject to the taxing provisions of the Agricultural Adjustment Act, enacted May 12, 1933. Under section 501(a)(1) of the Revenue Act of 1936 [1], its processing of pork was subject to the "unjust enrichment tax." No point is raised as to the amount of pork processed, nor as to correctness of $87,058.73, the amount of unjust enrichment tax calculated thereon by the Commissioner. The controversy arises as to whether there was shift of processing tax, and if so, whether a loss prevented taxation thereon to the petitioner. It filed an unjust enrichment tax return showing a loss in its pork operations. On account of the fact that it was not in existence during the entire six taxable years preceding the imposition of the tax, it had no data of its own to submit to show an average margin during that period as provided in section 501(e) of the Revenue Act of 1936 [2]. It was in business approximately six months of the six-year base period. In his determination of the deficiency the respondent found that petitioner *368 had shifted the entire burden of the taxes imposed upon it but not paid, without comparing the margin during the taxable year with an average margin of other representative concerns for the base period, and determined that petitioner had net income from the sale of articles with respect to which the tax was imposed of $91,665.03, and thus in excess of processing taxes of $87,058.73, imposed upon but not paid by petitioner on articles sold. In accordance with the provisions of section 501(a)(1) he limited the amount of unjust enrichment subject to income tax to the lesser of the two amounts, that is, $87,058.73. *369 I. The petitioner first argues therefore that determination of shift of tax was arbitrary and void. The usual rule of presumption of correctness of the deficiency determined, here obtains. Arden-Rayshine Co., 43 B.T.A. 314; Sophie Jaski, 43 B.T.A. 321; Binghamton Candy Co., 43 B.T.A. 327. A determination of deficiency is prima facie correct even though based on inference. We find such inference plain in the evidence. The processing taxes were entered in petitioner's books as part of the cost of hogs. Petitioner's president testified that an effort was made to recover all costs, including Federal taxes, and that it was in business for profit. From this evidence it is apparent that the policy of petitioner was to shift the burden of the tax to vendees. The Act contemplated that the consuming public should pay the tax. United States v. Poindexter and Sons Merchandise Co., 128 Fed. (2d) 992. Though the tax was not billed to vendees as a separate item, petitioner endeavored to pass it on and this, of itself, gives rise to an inference that the tax was shifted. *370 Colonial Milling Co. v. Commissioner, 132 Fed. (2d) 505 (December 10, 1942); Greenwood Packing Plant v. Commissioner, 131 Fed. (2d) 815, affirming 46 B.T.A. 632. The petitioner admits on brief that it has the burden to show that the Commissioner's assessment is invalid, but contends that the deficiency determined was arbitrary and that under Helvering v. Taylor, 293 U.S. 507, it need proceed no farther because such arbitrary deficiency is void and the respondent must, therefore, show the correct amount of tax. The argument is that the petitioner not having been in business during the six-year base period, the Commissioner under section 501(f) (1), [3] had the duty of producing, for use in computing the presumptive amount of tax shift under section 501(e), and by an examinatiion of representative concerns engaged in a similar business and similarly situated, an average margin for such base period; that the Commissioner having failed so to ascertain the six-year average margin, his determination otherwise than under section 501(e), of a shift of tax is arbitrary. *371 The nub of the petitioner's view is the failure of the Commissioner to ascertain the average margin for the six-year base period. Such average margin is undoubtedly prerequisite under the statute to computation of the presumptive extent of tax shift under section 501(e). But even if we assume, as the petitioner contends, that under section 501(f)(1) it is the duty of the Commissioner to ascertain the average margin in case of no six-year history in business on the part of the petitioner, it does not follow, in our opinion, that the mere showing of the Commissioner's failure to ascertain such average margin and his failure therefore to use it in determining the deficiency, demonstrates arbitrary action on his part. The statute provides, section 503(b) as follows: Every person upon whom a Federal excise tax was imposed but not paie * * * shall make a return under this Title, which return shall contain such information and be made in such manner as the Commissioner, with the approval of the Secretary, shall prescribe. Under the authority of that section and patently well within its provisions the Commissioner provided Regulations 95, Article 27(b). [4] Thereunder it was the petitioner's *372 duty to file a return on a prescribed form and in accordance with instructions printed thereon and clearly to set forth the data therein called for. In addition, the provisions of section 501 (e)(2) are applicable only "if the taxpayer so elects by filing his return on such basis." In short, in order to require the computation of the presumptive tax shift and therefore the use of the missing average margin, under either subsection of 501(e), the petitioner has first to show performance by itself, that is, by showing under either subsection the filing of a return upon the prescribed form in accordance with the printed instructions and giving data called for, and under the second subsection by showing filing of a return which constitutes making an election on the basis of section 501(e)(2). The object of such requirements appears to be to notify the Commissioner that the petitioner in fact expects to rely upon the presumptive tax shift under section 501(e). In many cases he might not so rely, and any procedure thereunder would be a sheer waste of time - such, for example, as a case where a petitioner, not denying the shift of tax, defended on the sole ground, under section 501(a)(1) *373 that he was not taxable because he had no "net income for the entire taxable year from the sale of articles with respect to which such Federal excise tax was imposed." Indeed, it appears that net loss was at least the primary contention of the petitioner in this case, for the return filed by it appears to have shown a net loss of $136,283.92 for the taxable year. *374 In Lee Wilson & Co. v. Commissioner, 123 Fed. (2d) 232, we find answer to the present question, in a case which though involving an appeal from the United States Processing Tax Board of Review, in our opinion offers a parallel. There the taxpayer had, as in the present case, not been in business for the period of average margin and contended that it was the duty of the Commisioner to procure the data as to average margin under section 907(c) of the Revenue Act of 1936, providing, in effect the same as section 501(f)(1) here involved, that if the claimant was not in business during such period the average margin should be that "of representative concerns engaged in a similar business and similarly circumstanced as determined by the Commissioner." The taxpayer therefore in its return furnished neither the data for the average margin nor those for the margin during the taxable period. Section 903 required that the taxpayer in his claim for refund should comply with the regulations prescribed by the Commissioner and clearly set forth all evidence relied upon in support of the claim, and thereunder Regulations 96, article 605, required the furnishing of *375 complete margin data showing the margin for both tax period and the base period. In addition, section 907 (a) provided for computation of prima facie showing, similar to that provided by section 501(e). In the light of such statutes the court said: * * * Assuming, without deciding, that the respondent had or was required to obtain the information as to the average margins of similar concerns for periods before and after the tax period in question, such information would have been useless in the absence of data as to petitioner's average margin during the tax period. Under the petitioner's theory as to the duty of the Commissioner, the petitioner should have given him the information to make the necessary comparisons, and, having failed to do so, is in no position to complain of the failure of the Commissioner to procure and use the information as to the average margins of similar processors. In the instant case the return filed by the taxpayer is not in evidence, so that we are not informed whether the taxpayer elected to proceed under subsection 501 (e)(2), or whether under section 503(b) it furnished in its return the information required by statute and the regulation. So *376 here it is apparent that the taxpayer, without showing that it was not derelict infurnishing, as required by statute and regulation as above seen, the requisite data to the Commissioner upon which he might have based the presumptive tax shift, is in no position to say that the Commissioner's determination of deficiency was arbitrarily based. That the Lee Wilson case, supra, was a proceeding to recover a refund does not distinguish it from the present case: for in both situations we find an initial burden upon the taxpayer, and a statutory-based prerequisite of a showing on his part before production of average margin data by the Commissioner can be required. In addition we note that under section 501 (f)(1), which forms the basis of the petitioner's argument on this point, the average margin is required only "when necessary for a fair comparison." Congress, in using this language, must have considered that under some circumstances it would not be necessary to resort to date from other and representative similar concerns. The petitioner, seeking to demonstrate the Commissioner arbitrary on this point, had the burden of showing what facts constituted the arbitrariness. Under *377 the above expression, obviously mere failure to obtain the six-year data is not per se proof of arbitrary action. Other circumstances may have precluded such state of mind. Thus, as above suggested, an apparent reliance by the petitioner, alone upon net loss for the year would seem to negative arbitrary attitude; other facts known to the Commissioner might have the same effect. Thus, the history of petitioner's predecessor company of the same name and conducted largely by the same personnel, might have been reasonable basis for conclusions. In the absence of proof as to what facts and circumstances actuated the Commissioner, and that data for a six year period was in fact necessary for comparison, a finding of arbitrariness would be unwarranted; and the petitioner is not in a position to complain that respondent was arbitrary in determining a deficiency not based upon the presumptive tax shift under section 501(e). In our opinion, the absence of such an indication to the Commissioner in the return and by the furnishing therein of the data required, by the statute and regulation, the Commissioner should not be held to have been arbitrary in not furnishing the average margin and *378 determining the deficiency in the manner prescribed in section 501(e). In the absence of such indication by the petitioner of reliance upon that section, the Commissioner may otherwise arrive at his determination without being open to the charge of being arbitrary. Moreover, in Arden-Rayshine Co., supra, we said: * * * That section 501 (e) was intended to do no more than suggest an approved method for establishing the fact essential to the determination of the tax, namely, the extent of the shift of the processing tax burden to others, and to give the computation under such method a presumption of correctness, is further shown by section 501 (i) of the act, which provides that either the taxpayer or the Commissioner may by proof of the actual extent to which the burden has been shifted to others rebut the presumption so established. Admittedly the petitioner in making its return did not supply the information necessary for a computation under either of the methods set forth in section 501 (e), and, accordingly, there is no presumption on the facts or under the statute as to the extent to which the burden of the processing tax here under consideration *379 was or was not shifted to others. * * * We hold that it has not been shown that the determination of shift of tax to others was arbitrary. II. The next contention of the petitioner is that respondent's computation of net income for the entire taxable year from the sale of articles with respect to which the tax was imposed was so arbitrary, inaccurate, unreasonable and unfair as to make the deficiency invalid. The question arises because section 501 (a)(1) as above seen, limits the amount subject to the unjust enrichment tax to the taxpayer's net income for the taxable year, from the sale of articles with respect to which the processing tax was imposed - in this case own-slaughter pork. The petitioner's contention of arbitrariness results largely from various allocations made by the respondent to determine sales, cost of material and expenses entering into the production of pork articles, and the exclusion of some items and the inclusion of others in his computations. Specifically, in the main petitioner urges arbitrary action by the Commissioner in that to determine gross income from own-slaughter pork he deducted from total sales of pork products the cost of purchased pork, plus *380 the arbitrary amount of 1 1/2 cents per pound; in that he improperly considered $6,356.71 as income attributable to sale of ownslaughter pork instead of to rent received; in that he treated $899.18 recovered on bad debts as income from own-slaughter pork; and in that he treated as income from own-slaughter pork an item of $316.19 received from rent on property not used in petitioner's operations. Considering the Commissioner's treatment of deductions claimed, the petitioner urges that he improperly allocated $253,684.94 in expenses of various kinds, and denied deduction of $20,453.77 attorneys' fees incurred in testing the constitutionality of the processing tax; also, that he understated the cost of beef by $9,994.16 in connection with petitioner's production of sausage. Whether a system of allocation is fair or so arbitrary as to require rejection in its entirety is a question of fact, as to which the petitioner has the burden of proof. The problem of determining net income from own-slaughter pork under the peculiar facts here is an unusual one and by no means free from difficulty. This must have been apparent to petitioner, for its unjust enrichment return reported a loss of $136,283.92 *381 and the computation relied upon before this Court shows a loss of $7,349.38 in own-slaughter hogs and a profit of $70,826.77 in all other dealings in meat, inedibles and produce. This wide difference of result of pork operations is unexplained and appears to be due in large part, at least to allocation methods used to determine net income from own-slaughter pork. Petitioner admits that net income attributable to own-slaughter pork can not be arrived at in this proceeding without some system of allocation of total sales and costs and that any method applied to the facts would result in no more than an approximation of actual sales and costs. [5] This is consistent with testimony of witnesses of petitioner that every method of allocating expenses of a packing house business has defects and is necessarily arbitrary. We have, as hereinafter set forth, considered in detail the voluminous and complicated facts presented, testing them as to whether so arbitrary, inaccurate and unfair as to render the Commissioner's computation invalid as charged. We need not here recite such facts, inasmuch as they are, under the conclusions to which we have come, carefully examined later. From review and *382 analysis of such facts so necessary of examination, it is our opinion that although there are inaccuracies and errors in the consideration of some of the details and though with reference to some points we think the petitioner's views are more nearly correct than those of the respondent, nevertheless that it can not fairly be found that the Commissioner's ultimate conclusion as represented in the determination of deficiency is so unreasonable, unfair or inaccurate as to call for a conclusion of arbitrariness; but that under all of the evidence it is our duty, as indicated in Helvering v. Taylor, supra, [6] to make corrections and adjustments where there is evidence covering the point; and that we can from the evidence correct errors appearing. This will accordingly be done. In short, considering the admitted difficulties of allocation in the situation here presented, we can not come to the conclusion that arbitrariness in the sense of action without basis in fact, reason or fairness appears in the Commissioner's determination. Though there is a wide divergence of approach and view between the petitioner and the respondent, review of the evidence here *383 does not, we think, reveal lack of good faith and presence of arbitrariness on the part of the respondent. *384 We will therefore now proceed to review the evidence in more detail with a view to determine to what, if any, extent error has been shown, making adjustments wherever required by the facts presented in evidence and as required of us by the Taylor case. In that case the record did not contain evidence sufficient for adjustment of facts. In this one the evidence is broad and we find adjustment possible and proper. Though the points of controversial fact above enumerated, as suggested by the petitioner, will all be covered, we will, for purposes of clarity deviate from the order in which enumerated. a. Petitioner paid an annual rental of $10,100 for the plant and coal yard used by it for the production of meat products, all of which the parties allocated among departments of petitioner's business. Petitioner subleased a portion of the plant for an annual rental of $11,000, and in addition thereto received rental of $882.80 for a building in Lexington, Ky. Petitioner treated the total amount of rent received as income derived from operations outside of its packing business. Respondent credited rent received in the amount of $12,402.80 to authorized deductions and allocated $6,672.90 *385 thereof to own-slaughter pork and the remainder to other departments of petitioner. The correct total amount of rent received is $11,882.80. Petitioner contends that only income derived from the sale of own-slaughter pork should be considered and that the amount was not received as rent, but in consideration of an agreement not to operate the ice plant except as, if and when directed by the other party to the contract. The substance of respondent's contention is that the rental income offsets rent paid. The parties agree that the primary problem is to determine the earnings of petitioner from the sale of own-slaughter pork. The rental income had no relation to sales of any commodity produced by petitioner and would have been payable without sales in any kind or amount. Substantially all of the income was the direct result of an agreement enabling petitioner to sublease a portion of the leased plant for more than it was obligated to pay as rent. The rent received constituted taxable income and the rent accrued or paid was deductible as a business expense for ordinary income tax purposes under the applicable statute. The parties agree that the items require such treatment. No logical *386 reason appears for treating the amounts otherwise to determine liability for tax on unjust enrichment. Offsetting rental expense by rental income, as respondent has done, disregards realities, and produces a fictitious result, and is contrary to accepted standards of reporting income and expenses for income tax purposes. On this point we sustain the petitioner. Old Colony R.R. Co. v. Commissioner, 284 U.S. 552, offers analogy. b. During the taxable year petitioner collected $1,869.02 of bad debts previously deducted as worthless. Respondent allocated $899.18 of the amount to own-slaughter pork, and used it to reduce the amount of selling and other expenses deducted in computing net income from the sale of articles with respect to which the tax was imposed. The respondent argues that his action is justified by the assumption that $1,869.02 of the $9,339.07 of bad debts charged off in the taxable year will be collected in future years. We do not know the history of petitioner's accounts receivable and are in no position to say that it was reasonable for respondent to assume that about one-fifth of its worthless accounts would be recovered in subsequent *387 years. Bad debts do not reduce the selling price of articles. Standard Knitting Mills, Inc., 47 B.T.A. 295. The ground for allowing a worthless debt as a deduction is that no part of the account will be collected. If some part of the debt is collected in a subsequent year, the amount may constitute income, not on account of current sales, but because of a prior deduction of the amount from gross income. No part of the bad debts charged off in the taxable year was, of course, recovered in that year. We know of no theory of constructive receipt that would treat them as income under the circumstances. The amount in question does not constitute income in 1935 from the sale of articles with respect to which the tax was imposed. c. In his determination of net income subject to tax under Title I of the applicable statute respondent allowed $20,453.77 as a deduction for legal fees paid for services rendered by the law firm of Steinfeld & Steinfeld in the suit instituted to test the constitutionality of the Agricultural Adjustment Act. He did not allow any part of it as a deduction in determining net income subject to tax on unjust enrichment under Title III *388 of the Act. The amount involved is not in controversy. Respondent contends that petitioner has not shown that the item was accruable in the taxable year and that the total amount was paid as a legal fee. Section 501(c)(1) provides that: (c) The net income from the sales specified in subsection (a) (1) shall be computed as follows: (1) From the gross income from such sales there shall be deducted the allocable portion of the deductions from gross income for the taxable year which are allowable under the applicable Revenue Act. The sales referred to in subsection (a)(1) relate to articles with respect to which the processing tax was imposed but not paid. There is proof of record that the board of directors of petitioner retained the firm of Steinfeld & Steinfeld to test the constitutionality of the Agricultural Adjustment Act for a contingent fee of 20 per cent of the processing tax saved. The statute was held to be invalid in United States v. Butler, 297 U.S. 1, on January 6, 1936, and the firm then became entitled to receive its fee. The fee was paid the same month. We had a like question in The Tobin Packing Co., Inc., 43 B.T.A. 642, *389 and allowed as an accrued business expense the fee applicable to processing taxes imposed but not paid during the taxpayer's taxable year. So much of the fee as was based upon taxes imposed after the taxable year was not involved in the proceeding. That decision controls the question here. Respondent also argues that if the fee is accruable for tax on unjust enrichment, some adjustment should be made for the periods before June 5, when suit was filed, and after the close of the taxable year, and for the amount received from the law firm by petitioner's president, F. E. Wernke. We agree that the fee is not an accruable expense in its entirety. There is no basis for denying a deduction for so much of the fee as relates to taxes imposed but not paid prior to the institution of the suit. The services of the attorneys were performed in connection with all of the taxes imposed but not paid, and the outcome of the litigation saved petitioner from paying taxes imposed before, as well as after, June 5 in the taxable year. The temporary restraining order obtained, prevented collection of taxes before, as well as after, the filing of the suit. The amount of the deduction should, however, be *390 reduced to the extent that it applies to taxes imposed after the close of the taxable year, for such portion of the total fee does not represent an accruable expense in the taxable year. Respondent contends that the attorneys' fee should be reduced because of receipt by Wernke from Emile Steinfeld, a member of the firm of attorneys, of $6,500 in stock in petitioner and about $2,175 in cash. The evidence on the point is to a considerable extent conflicting. Wernke reported no such income in his return, though noting some stock in petitioner received for expenses. Later, however, his return was adjusted by the collector and he paid additional tax because of receipt of the $6,500 in petitioner's stock; and the respondent has allowed deduction of the entire $20,453.77 as attorneys' fees in computing petitioner's net income. Under such circumstances, we hold that the stock and money was received by Wernke for services rendered to, and expenses paid for, Steinfeld in connection with processing tax cases, and did not affect the amount of attorneys' fee involved in this matter. Petitioner sold pork products to charitable institutions and received credits for the processing tax involved in *391 the sales, the number of live weight pounds of hogs involved therein during the last ten months of the taxable year being 309,884. It is apparent that petitioner was not saved any taxes in connection with such sales, and was under no obligation to pay the firm a fee based upon the nontaxable processing thereof. Accordingly, we hold that so much of the fee as relates to savings to petitioner on taxes imposed but not paid during the taxable year constitutes a deductible expense in computing net income from sales of own-slaughter pork. Such amount is not shown by the record. The evidence shows that taxes in the amount of $95,048.62 were imposed but not paid during the taxable year. The amount of taxes imposed but not paid after the close of the taxable year is not shown and the record is silent on whether the fee paid includes an amount based upon nontaxable sales to charitable institutions. The amount deductible will be left for agreement of the parties under Rule 50. d. As already pointed out, the petitioner now contends that it sustained a loss of $7,349.38 from sales of own-slaughter pork during the whole taxable year, an amount about $129,000 less than the loss shown in its return. *392 The reason for the difference in results is not disclosed by the record nor explained by petitioner upon brief. The statement attached to the deficiency notice shows the total figures returned by petitioner for sales, costs of material and expenses, and that the return included a statement of finished tonnage sold, exclusive of sausage and boiled and baked ham. The loss of $7,349.38 resulted, in part, from the allocation of aggregate sales and costs of pork, and expenses incident thereto. The respondent determined net income of $154,424.08 for the entire year from the sale of own-slaughter pork articles, an amount equal to $.023690713 per pound on 6,518,338 live weight pounds of hogs; net income of $101,041.89 after deducting processing tax paid, and the tax imposed on articles in the opening inventory, and net income of $91,665.93 from the sale of non-tax paid pounds of own-slaughter pork. The wide gap between the results of their computations of gain or loss is due primarily to differences of opinion as to how the amount of sales of own-processed hogs should be determined and methods used in allocating costs and expenses to such sales. The necessity for some method of allocation *393 is apparent. Petitioner purchased and slaughtered live stock including hogs, and dealt in produce. It also purchased dressed beef and pork and other products from other packers, the processing tax on which is not involved herein. The meat so purchased was generally commingled with own-slaughter meat and lost its identity and some of it was mixed with meat of its own slaughter in further processing, such as beef with pork in the production of sausage. It sold some of the meat in a fresh state and further processed the remainder by converting it into chili, hams, bacon, various kinds of sausage and other meat commodities. Inedible articles, such as grease, tankage and tallow, were produced as byproducts. The books of petitioner show receipts from sales of the various articles sold, but without allocation between purchased and own-slaughter pork and beef. Petitioner's business consisted of several departments, including departments for beef, sausage and pork. Some employees performed services in more than one department, and their wages were not departmentalized nor allocated between pork and other meats processed and handled therein. Except for a small amount, about which no point *394 is made, the parties agree upon net sales of pork products, including sausage, some of which contained a mixture of beef. Their chief disagreement is on how to separate the own-slaughter pork content thereof from purchased pork. Petitioner's approach to the problem differs fundamentally from that of respondent. It determined sales in its pork department in this way: Invoices received for purchases of pork were examined and such items as were to be sold without further processing were priced at the prevailing price that day. Other pork, requiring further processing, was priced at the selling price as of the estimated dates of completion with undisclosed allowances for loss in weight, and sales discount. The result was a finding that of total gross sales of $873,792.97 the amount of $162,547.72, or about 18.6%, were of purchased pork. The remainder of $711,245.25 was allocated to own-slaughter pork without applying any formula to test its accuracy. Boiled and baked hams were produced from own-slaughter pork in the sausage department and sales thereof in the net amount of $52,297.69 were entered in a separate account. There is no controversy on the amount thereof. Sales of sausage from *395 own-slaughter pork and other material, including beef, were determined by petitioner to be in the same ratios as the weight of each class of green material was to the whole weight. Petitioner's records showed the amount of each class of green meat used. In that way petitioner found that of the net sales of $247,140.45 of sausage, $68,062.48, or 27.54%, were of own-slaughter pork and the remainder of $179,077.97 of other materials. Petitioner's sausage figures includes sales of chili, an all beef article produced in its sausage department. Respondent determined sales of purchased pork by a write-up of 1 1/2 cents per pound on 1,061,954 pounds costing $162,993.23. The resulting figure of $178,922.54 was then deducted from gross sales of $1,177,446.82, of all pork products, including sausage and then from the remainder, the amount of $16,447.40 was deducted for returns and allowance and freight to reach net sales of $982,076.88 of own-slaughter pork. Respondent eliminated chili from the computation by a deduction of $10,920. Sausage containing beef was included in pork sales by both parties. Respondent's determination of sales from own-slaughter pork is about $150,000 in excess of *396 petitioner's computation and his mark-up on purchased pork results in a gross profit of about $16,000 on that class of pork. Petitioner strenuously objects to the method used by the respondent to eliminate purchased pork from sales of all pork products and insists that the amount is understated by $38,288.05, based largely upon poundage and costs taken from its exhibits, which are also open to criticism. The mark-up of 1 1/2 cents per pound was not explained in the deficiency notice and respondent not only did not offer any testimony to support it, but does not discuss the item upon brief. All we know is that the figure was estimated by respondent and was not taken from petitioner's records. The circumstances were unusual and respondent, with knowledge that the burden of the tax had been shifted, was under a duty to determine the amount of income tax liability for unjust enrichment by the best means available to him. Some method of allocation was necessary. The question is whether the method produced a reasonable result. We had a similar question in Standard Knitting Mills, Inc., supra. There the processor commingled purchased cotton yarn with yarn *397 of its own manufacture from cotton in the production of underwear. We held that in making the marginal computations under the statute the entire amount for which the garments were sold should be treated as the "selling price" of the articles, and that the "margin per unit" should be adjusted on a poundage basis for purchased yarn. The same result can be reached hereby deducting from total sales of all articles of pork content the proportionate part consisting of purchased pork. In the Standard Knitting Mills, Inc., case the poundage of each class of yarn was shown. Here, due principally to lack of records, the exact poundage is not shown. Enough has been proved, however, to make a calculation under the rule more fair and reasonable than the estimated figure used by respondent. In his computation of a unit margin respondent determined from returns filed by petitioner that it slaughtered 6,071,883 live weight pounds of pork during the taxable year, that the live weight of its opening and closing inventories was 721,476 pounds and 275,021 pounds, respectively, and accordingly, that it sold 6,518,338 live weight pounds of pork. We are not aware of the method used by him to compute *398 the live weight of the inventories, but it is not questioned by petitioner. He also found that there were 1,061,954 pounds of purchased pork in the articles sold. His explanation is merely: "Allotment to purchased pork on basis of 1 1/2( mark up on 1,061,954 pounds, costing $162,993.23." The poundage represents the sales weight of processed pork, not live weight. The petitioner's proof does not include the live weight of either class of pork. Its computations of profit in the pork department are based upon sales weight and upon weight of green material used in the sausage department, bases we do not regard so accurate or fair as those of respondent. Petitioner's president testified that prime hogs lose 30 per cent of their live weight in slaughtering operations. We accept this testimony as the best evidence of record for the conversion of the weight of the purchased pork into live weight pounds and accordingly conclude that the live weight of the purchased pork was 1,517,077 pounds, or 18.8798836 per cent of the live weight of all pork sold during the taxable year. This percentage of gross sales of $1,177,446.82, or $222,300.59, is held to be the amount realized from the sale of *399 articles containing purchased pork. e. The parties now agree that the gross proceeds of sales of chili were $10,920. Respondent reduced gross profit of own-slaughter pork by this amount, plus $42,015.16 for other beef transferred by petitioner in sales of pork products. Petitioner charged its sausage department with $62,929.32 for beef used therein in the production of sausage and chili, an amount $9,994.16 in excess of the total of the charges made by respondent. Petitioner treats the amount in its computation as cost of material other than own-slaughter pork. Thus the parties agree that cost of beef should not be reflected in net income derived from own-slaughter pork. The record fails to disclose how respondent computed his figure. Petitioner maintained a record of the beef transferred to its sausage department and charged it to that department at the current Chicago market price. Although we do not know the basis for respondent's finding, we do not think its presumptive correctness has been overcome by petitioner. Petitioner's figure represents price in another market, not cost to it. It does not appear whether the prices used by petitioner were f.o.b. Chicago or Louisville. *400 If the former, freight and other delivery charges would account for some of the discrepancy. Obviously it includes a margin for profit to the seller. Petitioner has not shown, and does not contend, that actual cost was not the figure used by respondent. It merely asks us to substitute for it a figure known not to represent cost. Petitioner has not shown respondent's figure to be wrong and it will not be disturbed. f. The petitioner urges error in the respondent's allocation between own-slaughter pork and other departments, of deductions for expenses aggregating $253,684.94. It used various methods to apportion costs of operation among the departments of its business. Costs such as taxes, fire insurance, heat, light and power, rent were allocated on the basis of production space occupied. Indirect labor and executives' salaries were allocated in proportion to direct labor expense. Accounting costs, postage, office supplies and similar expenses were allocated on the basis of items sold. Traveling expenses, automobile allowances, dues and subscriptions, interest, bad debts and other costs regarded by petitioner as requiring like treatment were allocated on the basis of gross sales. Expenses *401 incurred in delivering goods were apportioned on the basis of weight of article sold. Costs so allocated to the pork and sausage departments were then apportioned among the products produced therein and when necessary, between own-slaughter and purchased pork, on the basis of gross sales, sales weight or value of material used. The respondent used a simpler method. Selling, delivering, administrative and other allocable deductions, a total of $169,765.11, were allocated on the basis of sales weight, with an apportionment between purchased pork and own-slaughter pork. Direct labor was charged to the department in which the service was performed, except as follows: To Beef
To Pork
Sausage
5%
95%
Smoke house, baked
hams
20%
80%
Tank house
95%
5% All of the amount allocated to pork was allocated to own-slaughter pork. Indirect labor aggregating $26,493.99, and other costs in the amount of $42,333.99 were allocated on the basis of sales weight, all of the cost allocated to pork being assigned to own-slaughter pork. Of the cost of supplies and containers, paper and twine, and storage, 95% was allocated to pork, and 5% to beef, with no allocation as to pork to other *402 than own-slaughtered pork. Of the total expenses allocated on the basis of sales weight, about 45 per cent thereof was allocated on the basis of weight, which included the tonnage of cattle slaughtered by petitioner for others. Petitioner contends that the respondent's method of allocation is not only arbitrary, but leads to unjust results because the same factor is used, irrespective of proof that practically all of petitioner's beef was sold in a green state within about eight days after being slaughtered, while the greater part of its pork was sold in a cured, smoked or cooked state not sooner than about three weeks after being slaughtered, and that produce and other articles required no further processing. The simple method used by respondent does disregard the differences pointed out by petitioner. But petitioner and its witnesses agree that no system of allocation of income and expenses under the unusual circumstances prevailing herein, would produce accuracy. Petitioner's allocations are subject to similar criticism. For instance, one of petitioner's witnesses testified that allocation of the cost of fire insurance on a valuation basis would be fairer than the occupied productive *403 space used by petitioner, and that ammonia used in refrigeration should be allocated on the basis of cubic space, rather than productive area, with which petitioner's counsel now agree. Chili, a 100 per cent beef product, manufactured in the sausage department, was not included in sales of beef. Boiled and baked hams sold by petitioner were produced from purchased and own-slaughter meat, but there was no allocation of sales and costs between the two classifications. Total sales of pork products do not include the selling price or weight of grease or tankage, pork byproducts. The computation of costs of curing and smoking pork does not include adjustments for opening and closing inventories. Allocations of sales of sausage on the basis of weight of material used assumes that no more was received for expensive trimmings than cheaper material. Sales commissions were not paid on all sales, yet the total was allocated to all beef and pork products and produce on the basis of weight. Whether the commissions were based upon weight and were paid on sales of each of the articles to which allocations were made, does not appear. If the latter, there would be no need for allocations. Petitioner's *404 method of allocating executives' salaries on the basis of direct labor is not the one commonly used. Discussion of the differences between the computations of the parties in further detail is unnecessary. Neither party attempts to point out all of the faults of the allocations of the other party, or contends that any method of allocation would more than approximate the correct financial result of own-slaughter pork operations. We have corrected various errors in respondent's computation. From a careful consideration of all of the facts and testimony of record, we are unable to conclude that petitioner has overcome the presumption of correctness of respondent's allocations of expense, except as hereinbefore adjusted by us. We have now considered the question of correctness of the respondent's conclusions in arriving at the amount of petitioner's net income from own-slaughter pork for the entire year. On some points of controversy we have found error both by the Commissioner and the petitioner, but error adjustable from the whole evidence, and such adjustments we have made within the intent of the Taylor case. The result is modification of the Commissioner's determination of *405 amount of net income from the process-taxed pork for the entire taxable year, which limits the amount of unjust enrichment tax. As so modified and adjusted, the determination of deficiency is approved. The adjustments will be reflected under Rule 50. The petitioner questioned the constitutionality of the tax on unjust enrichment. The issue was referred to by counsel for petitioner in his opening statement at the hearing, but is not discussed upon brief. The tax is constitutional. Sportwear Hosiery Mills, 44 B.T.A. 1026; Cornett-Lewis Coal Co., 47 B.T.A. 571, and cases cited therein. Petitioner's taxable year ended October 31, 1935. Its unjust enrichment tax return was due September 15, 1936. Section 503 (b), Revenue Act of 1936. The time for the filing of the return was extended to not later than December 15, 1936. T.D. 4689;T.D. 4696. Collectors had authority to extend the period for not to exceed six months. Article 32, Regulations 95. It does not appear that any extension of time for the filing of the return after December 15, 1936, was requested by petitioner. *406 The unjust enrichment tax return of petitioner was filed May 15, 1937. In his determination of the deficiency, respondent imposed a delinquency penalty of 25 per cent of the amount of the deficiency. Petitioner offered no testimony to show that its failure to file a return within the time prescribed by law was due to reasonable cause and was not due to wilful neglect, and its counsel does not discuss the issue upon brief. The action of the respondent in imposing the delinquency penalty on the tax herein was not error. A. G. Fides, 47 B.T.A. 280. Decision will be entered under Rule 50. Footnotes
1. ↩
Interest and discount
$ 820.03
Collection debts previously
charged off
1,869.02
Rent: Sublease of portion
of plant rented
by petitioner
$11,000.00
Building, Lexing-
ton, Ky
862.80
11,882.80
Total
$ 14,571.85
1. Loss↩
1. Portion of selling and other expenses allocable to own-slaughter hogs.↩
1. SEC. 501. TAX ON NET INCOME FROM CERTAIN SOURCES. (a) The following taxes shall be levied, collected and paid for each taxable year (in addition to any other tax on net income), upon the net income of every person which arises from the sources specified below: (1) A tax equal to 80 per centum of that portion of the net income from the sale of articles with respect to which a Federal excise tax was imposed on such person but not paid which is attributable to shifting to others to any extent the burden of such Federal excise tax and which does not exceed such person's net income for the entire taxable year from the sale of articles with respect to which such Federal excise tax was imposed. * * * * *↩
2. (e) For the purposes of subsection (a) (1), (2), and (3), the extent to which the taxpayer shifted to others the burden of a Federal excise tax shall be presumed to be an amount computed as follows: (1) From the selling price of the articles there shall be deducted the sum of (A) the cost of such articles plus (B) the average margin with respect to the quantity involved; or (2) If the taxpayer so elects by filing his return on such basis, from the aggregate selling price of all articles with respect to which such Federal excise tax was imposed and which were sold by him during the taxable year (computed without deduction of reimbursement to purchasers with respect to such Federal excise tax) there shall be deducted the aggregate cost of such articles, and the difference shall be reduced to a margin per unit in terms of the basis on which the Federal excise tax was imposed. The excess of such margin per unit over the average margin (computed for the same unit) shall be multiplied by the number of such units represented by the articles with respect to which the computation is being made; but * * * * *↩
3. (f) As used in this section - (1) The term "margin" means the difference between the selling price of articles and the cost thereof, and the term "average margin" means the average difference between the selling price and the cost of similar articles sold by the taxpayer during his six taxable years preceding the initial imposition of the Federal excise tax in question, except that if during any part of such six-year period the taxpayer was not in business, or if his records for any part of such period are so inadequate as not to furnish satisfactory data, the average margin of the taxpayer for such part of such period shall, when necessary for a fair comparison, be deemed to be the average margin, as determined by the Commissioner, of representative concerns engaged in a similar business and similarly circumstanced. ↩
4. ART. 27. RETURNS. - * * * * *
(b) The return shall be under oath and shall be made on the prescribed form in accordance with the instructions printed thereon and in accordance with the regulations. Copies of the prescribed return forms may be obtained by taxpayers from collectors. A taxpayer will not be excused from making a return because of the fact that no return form has been furnished to him. Taxpayers should make application therefor to the collector in ample time to have their returns prepared, verfied, and filed with the collector on or before the due date. Each taxpayer shall carefully prepare his return so as fully and clearly to set forth the data therein called for. Returns which have not been so prepared will not be accepted as meeting the requirements of the Act.↩
5. On brief, petitioner says: Therefore there is nothing unusual or strange about the fact that petitioner's net income attributable to the sale of the products of its own-slaughter pork can only be approximated by the allocation of income and expenses. The law does not expect or demand mathematical exactness in such allocation. ↩
6. Unquestionably the burden of proof is on the taxpayer to show that the commissioner's determination is invalid. Lucas v. Kansas City Structural Steel Co., 281 U.S. 264, 271. Wickwire v. Reinecke, 275 U.S. 101, 105. Welch v. Helvering, 290 U.S. 111, 115. Frequently, if not quite generally, evidence adequate to overthrow the commissioner's finding is also sufficient to show the correct amount, if any, that is due. * * * On the facts shown by the taxpayer in this case, the board should have held the apportionment arbitrary and the commissioner's determination invalid. Then, upon appropriate application that further hearing be had, it should have heard evidence to show whether a fair apportionment might be made and, if so, the correct amount of the tax. * * * [ Helvering v. Taylor, 293 U.S. 507, 515↩.]